# In re BARE ESCENTUALS, INC. SECURITIES LITIGATION.

**This document relates to: All Actions.**

**No. C 09–3268 PJH.**

United States District Court, N.D. California.

Sept. 30, 2010.

**1056**

David A. Rosenfeld, Mario Alba, Jr., Samuel H. Rudman Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Shawn A. Williams Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, for Material Yard Workers Local 1175 Benefit Funds individually and on behalf of all others similarly situated.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

PHYLLIS J. HAMILTON, District Judge.

The individual defendants' and the underwriter defendants' motions to dismiss and plaintiffs' motion to strike came on for hearing before the court on July 21, 2010. Lead plaintiffs Westmoreland County Retirement System and Vincent J. Takas, on behalf of certain purchasers of Bare Escentuals' common stock (collectively "plaintiffs"), appeared through their counsel, Mary Blasy. Defendant Bare Escentuals, Inc. ("Bare" or "the Company"), along with numerous individual defendants [1] (all

---

1. The specific individual defendants are named as follows: Leslie A. Blodgett (CEO and Director of the Board of Bare Escentu-als); Myles B. McCormick (Executive VP, CFO, and COO of Bare Escentuals), Ross M. Jones (Director and Chairman of the Board of

collectively "Individual defendants"), appeared through their counsel, Jerome F. Birn, and Kelley M. Kinney. The investment banking defendants, Goldman, Sachs & Co., CIBC World Markets Corp., Banc of America Securities LLC, Piper Jafray Companies, Thomas Weisel Partners LLC, and SunTrust Robinson Humphrey, Inc. (collectively the "Underwriter defendants"), appeared through their counsel, Kris Elder and Robin Wechkin. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court GRANTS in part and DENIES in part the Individual defendants' motion to dismiss, DENIES the Underwriter defendants' motion to dismiss, and GRANTS in part and DENIES in part plaintiffs' motion to strike.

## BACKGROUND

This is a securities class action brought against defendants Bare Escentuals, certain of its current and former directors and executives, and its investment bankers, for violations of the federal securities laws. *See generally* Corrected Consolidated Complaint ("CCC").

Plaintiffs generally assert claims based on alleged violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). They allege Securities Act claims on behalf of purchasers of Bare Escentual's common stock issued pursuant to certain allegedly false Registration Statements and Prospectuses filed with the Securities and Exchange Commission ("SEC"), in connection with the Compa-ny's September 28, 2006 initial public offering ("IPO"); and the March 14, 2007 follow-on offering ("March 2007 Offering"). Plaintiffs also allege Exchange Act claims on behalf of themselves and all other purchasers of Bare Escentuals stock issued between September 28, 2006 and October 30, 2008 (the "Class Period"). *See* CCC, ¶¶ 1, 215.

### A. General Background Allegations

Bare develops, markets and sells branded cosmetics and skin care products under its bareMinerals, RareMinerals, Buxom, and md brands. It utilizes what it characterizes as a "distinctive marketing strategy and a multi-channel distribution model utilizing traditional retail distribution channels consisting of;" "premium wholesale, including Sephora, Ulta and selected department stores;" company-owned boutiques; spas and salons; and direct to consumer distribution channels like QVC, infomercials, and online shopping. CCC, ¶ 2.

The Bare Escentuals brand dates back to the opening of its first boutique in 1976, with products marketed through the QVC home shopping network since 1997. *See id.*, ¶ 3. It was not until 2001–2006, however, that Bare Escentuals experienced exponential sales growth. This was in part due to the fact that Bare Escentuals was a "first-mover" in the mineral powder makeup phenomenon (which peaked in 2008). By 2002, consumers had flocked to try the "bare mineral powder makeup" that Bare Escentuals specialized in. To that end, Bare Escentuals' sales increased ten-fold,

Bare Escentuals, and managing director of Berkshire Partners LLC), Bradley M. Bloom (Director of the Board of Bare Escentuals and managing director of Berkshire Partners LLC), John C. Hansen (Director of the Board of Bare Escentuals and President of JH Partners), Michael J. John (Director of the Board of Bare Escentuals and senior partner of JH Partners), Lea Anne Ottinger (Director of the Board of Bare Escentuals and vice president at Berkshire Partners), Karen M. Rose (Director of the Board of Bare Escentuals), Glen T. Senk (Director of the Board of Bare Escentuals), and Diane M. Miles (President of Wholesale and Int'l Sales at Bare Escentuals).

from annual sales of $25 million in 2001 to over $250 million in 2005. In the months leading up to the company's late 2006 IPO, the company's sales rose to more than $394.5 million. *See* CCC, ¶¶ 3–5.

Plaintiffs allege several instances of allegedly wrongful conduct on the Company's part vis-a-vis its investors. Back in December 1998, for example, the Company entered into an agreement with QVC, pursuant to which QVC was granted the exclusive right to promote, advertise, market, sell and distribute Bare Escentuals products in all distribution channels in the United States other than company-owned boutiques and prestige retail channels. *Id.,* ¶ 8. In September 2006, Bare Escentuals and QVC entered into a letter agreement amending the 1998 agreement. *Id.,* ¶ 9. Pursuant to the amended letter agreement, Bare Escentuals could promote, advertise, market and sell its products on its websites, advertising, and catalog and mail promotions, as long as it paid QVC a royalty. Bare Escentuals was still prohibited from selling products through retail channels not considered 'prestige,' like discount stores, warehouse stores and superstores. *Id.* And QVC, in turn, was granted the exclusive right to promote, advertise, market and sell Bare Escentuals products in Japan, Germany, and the United Kingdom. *Id.*

In September 2006, however, and at the time of Bare Escentuals' IPO, plaintiffs allege that the company was not in compliance with the spirit or word of the QVC exclusivity agreement. In fact, allege plaintiffs, while Bare Escentuals repeatedly touted its "multi-channel distribution strategy" in its IPO Registration Statement/Prospectus filed with the SEC, and furthermore touted its ability to reinforce the premium image of the company's brands, defendants were at the time concealing that Bare Escentuals had already undertaken preparations to provide its

products to big box discounters Costco and Target for the 2006 Christmas season. *See* CCC, ¶ 11. Defendants were also aware, at some point before Fall 2007, that their products were being sold on Target's website, and that by early Spring 2008, Target was displaying Bare Escentuals' products in its sales circular. *Id.* As proof of this, plaintiffs allege that Bare Escentuals filed litigation against Costco in federal court in January 2007, seeking to stop Costco from selling Bare Escentuals products—an act that Bare Escentuals alleged in the lawsuit was "unauthorized." *Id.,* ¶ 12. Nonetheless, allege plaintiffs, defendants concealed their knowledge of these big box discounter sales, including the Costco litigation, from the investing public, until the company's outside auditors mandated disclosure in connection with disclosure of the company's 2007 annual financial report in February 2008. CCC, ¶ 14.

Plaintiffs allege that the Target and Costco sales dramatically diluted Bare Escentuals' pricing power, and forced the company to disclose that it was reducing the price of certain makeup starter kits from $60, to as low as $15 by the end of the Class Period on October 30, 2008. CCC, ¶ 15. The Target and Costco sales also purportedly jeopardized the company's relations with its prestige wholesalers, and Sephora and other wholesalers would slash their orders and contribute to a decline in sales during 2007. CCC, ¶ 16.

Plaintiffs further allege that, unbeknownst to investors—because defendants allegedly concealed this fact—a significant portion of the company's 2001–2006 direct to consumer sales growth was dependent upon Bare Escentuals' ability to unwittingly sign up customers for "club" sales programs—wherein customers' credit cards were automatically billed for multiple shipments beyond their initial orders, and without the customers' consent. *See* CCC,

¶ 18. Bare Escentuals, which recognized these "club" sales when merchandise was shipped from a warehouse directly to customers, was able to "capture, obtain, and report several years worth of phenomenal premium sales" employing this "guise" leading up to the September 2006 IPO. *See id.*, ¶ 19. Eventually, however, the company would be forced to refund preciously-recognized sales, and many direct to consumer sales customers became brick-and-mortar shoppers instead. Thus, in the two years following the company's September 2006 IPO, the direct to consumer sales "plummeted" from $179 million in FY 2006 (representing 45.6% of all sales) to $170 million in FY 2008 (representing 30.6% of all sales). *Id.*, ¶ 19.

Concomitant with the foregoing, plaintiffs further allege that Bare's aggressive drive to open hundreds of "brick-and-mortar" sales channels during the class period, was also cannibalizing sales from the company's other distribution channels—including its own boutiques, infomercial sales, QVC and even prestige wholesalers. *See* CCC, ¶¶ 20–21. The Company's IPO Registration Statement/Prospectus, for example, stated that Bare planned to further penetrate its "multiple distribution channels" via increasing sales through its key premium wholesale accounts, by expanding its base of company-owned boutiques, and growing its infomercial sales. Instead, plaintiffs allege that by December 31, 2008, Bare had opened over 750 "brick and mortar" sales channels, including sales outlets in single shopping malls. According to plaintiffs, no effort was made by Bare to coordinate the "multiple competing sales spots that were popping up." *Id.*, ¶ 21. As a result, say plaintiffs, Bare's own boutiques were competing with multiple other of its retail and wholesale sales outlets, and the "rampant expansion" in brick and mortar sales locations was at the expense of infomercial sales growth. *Id.*, ¶ 61.

In addition, plaintiffs allege that Bare planned to "[l]everage [its] strong market position in foundation to cross-sell [its] other products," and to that end, expressly stated that "[the Company had] demonstrated success in cross-selling [its] non-foundation products in channels where [it] interact[ed] directly with consumers, such as in [Bare] boutiques and on home shopping television." CCC, ¶ 68. In reality, allege plaintiffs, Bare's cross-selling efforts had failed. *Id.*

Plaintiffs generally allege that all the foregoing defects in the Company's sales model could, and did, render sales projections inaccurate by throwing them off. Collectively, the foregoing defects rendered Bare Escentuals' class period sales projections and stock valuations utterly meaningless. *Id.*, ¶ 22.

Meanwhile, plaintiffs allege the company's insiders were "cashing in." Beginning in June 2004, the company's two private equity sponsors—Berkshire Partners LLC ("Berkshire Partners") and JH Partners, LLC ("JH Partners")—began a series of "recapitalizations" in which their affiliates and certain members of the company's management acquired a majority controlling interest in the company. CCC, ¶ 25. To that end, on June 10, 2004, Bare Escentuals entered into management agreements with Berkshire Partners and JH Partners. *Id.* In February 2005, the company took on another series of "recapitalizations," whereby the company took on debt and used significant cash to pay hundreds of millions of dollars in dividends to its private equity sponsors and executives. Then, in September 2006, the company completed its IPO in order to repay the outstanding indebtedness and to buy out the management agreements with Berkshire Partners and JH Partners. *Id.*, ¶ 26. As proof, plaintiffs point out that all the foregoing was

detailed in an October 2006 expose that was published in Business Week. *Id.*, ¶ 24.

In March 2007, Bare Escentuals, its private equity partners, and certain of the company's senior executives again went back to the capital markets, as Bare Escentuals issued and offered another 575,000 shares (i.e., March 2007 Offering). *See* CCC, ¶ 27. Then again, in June 2007, Bare Escentuals offered another 100,000 shares ("June 2007 Offering"). *Id.*, ¶ 28.

Simultaneously, plaintiffs also allege that defendants issued a series of false and misleading statements concerning Bare Escentuals' sales practices and business model. *See* CCC, ¶ 29. Generally, as detailed in greater specificity throughout the complaint, plaintiffs allege that defendants' Registration Statements/Prospectuses issued in connection with the IPO, the March 2007 offering, and the June 2007 offering, were false when filed with and declared effective by the SEC. They misrepresented and/or failed to disclose, among other things, that: (a) the company's premium product image was being diluted by sales through discounters like Costco and Target; (b) the company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (c) the company's ability to continue garnering the premium "club" deal sales revenues from its direct to consumer infomercial and QVC sales program was diminishing.

As a result, the company's stock traded up to $28 in its first day of trading following the IPO, and continued to be inflated by defendants' false statements, trading over $43 per share in May 2007, and permitting Bare Escentuals to issue and sell over 18 million shares in its September 2006 IPO, and allowing the company's private equity sponsors and executives to receive over $700 million in proceeds in the March and June 2006 follow-on offerings.

On October 30, 2008, the company management announced that the company would be forced to cut prices and its financial guidance going forward and during late 2008, with the company revamping its marketing campaign, and offering lower priced starter kits. *See* CCC, ¶ 31. The company also disclosed that its inventory levels rose 55% in FY 08, while revenues rose just 2%. Plaintiffs allege that, as the truth about Bare Escentuals and its financial operations reached the market, the price of the company's common stock plummeted, to close at $4.18 per share on October 31, 2008—almost 80% below the IPO price and more than 87% below the March 2007 and June 2007 offering prices. CCC, ¶ 31. In addition, throughout 2009, plaintiffs allege that Bare Escentuals' sales have been ravaged by "de-stocking" efforts at its premium wholesalers, resulting in the company reporting an 11.5% revenue decline for the first quarter 2009. *Id.*

## B. Alleged Misrepresentations/Statements

In addition to the foregoing general allegations, plaintiffs' complaint more specifically details various groupings of allegedly false and deceptive misrepresentations and/or statements made by defendants. The relevant groupings of misrepresentations and/or statements are as follows: (i) false and deceptive IPO Registration Statement/Prospectus; (ii) false and deceptive March 2007 Offering Registration Statement/Prospectus; and (iii) defendants' other false and misleading class period statements.

### i. IPO Registration/Statement Prospectus

On June 30, 2006, Bare Escentuals filed with the SEC a Form S–1 Registration Statement and Prospectus ("IPO Offering Statement/Prospectus"). CCC, ¶ 57. The company initially forecast its shares would be sold in the $15–$17 range. On Septem-

ber 28, 2006, the IPO resulted in Bare Escentuals' sale of 18.4 million shares of its common stock at $22.00 per share. The stock opened at $28 per share, however, up 27.3% from its IPO price. *Id.*

Plaintiffs allege the following untrue statements in connection with the Registration Statement/Prospectus:

- the statement that "a core element of the Company's success was its distinctive marketing strategy and multi-channel distribution model" was false because defendants knew then that the company's expansion was cannibalizing sales from various sales channels;

- the statement that defendants planned to "further penetrate each of their multiple distribution channels" by increasing net sales to premium wholesale accounts and by expanding company-owned boutiques was false, since defendants instead engaged in a rampant expansion effort to chase immediate sales that resulted in the cannibalization of sales, instead of sales growth;

- the statement that Bare Escentuals' customers "Exhibited brand loyalty and enthusiasm for its products" was false, since the direct to customer sales program started in 2001 was really the result of unwittingly joining customers as "club" sales members, without their consent;

- the statement that the company's "multi-channel distribution strategy provided for greater consumer diversity reach and convenience while reinforcing the authenticity and premium image of the company's brands" was false, since the company was in reality selling to mass discounters like Costco and Target, thereby significantly undermining the company's reputation as a premium product seller;

- the statement that the company "planned to open a total of seven new boutiques in 2006 and ten new bou-

tiques in 2007" for a total of 12 boutique openings was false, since as of December 30, 2007, the company actually had 51 open company-owned boutiques;

- the statement that Bare Escentuals intended to "continue to increase net sales through key premium wholesale accounts" and would "explore additional opportunities to sell its products in premium department stores" was false, since Bare Escentuals was selling to Costco and Target—entities that were not "premium" department stores

- statements contained in Bare Escentuals' December 1998 agreement with QVC and the September 2006 written amendment to that agreement—which were attached to the SEC Statement/Prospectus—to the effect that QVC had the exclusive right to promote and sell Bare Escentuals products, were false, since Bare Escentuals was selling to Costco and Target; and

- the statement that the company had to date "demonstrated success in cross-selling its non-foundation products" in certain sales channels was false, since in reality, Bare Escentuals' cross-selling efforts had failed

*See* CCC, ¶¶ 57–71.

### ii. March 2007 Registration/Statement Prospectus

On February 16, 2007, Bare Escentuals filed with the SEC a Form S–1 Registration Statement and Prospectus ("March 2007 Offering Statement/Prospectus"). CCC, ¶ 72. After an additional amendment, the offering was priced and on March 13, 2007, Bare Escentuals, and certain selling stockholders, sold 13.8 million additional shares of its common stock at $34.50 per share. Bare Escentuals itself sold 575,000 new shares of stock, and the

remaining 13.225 million shares were sold by Berkshire Partners, JH Partners, and other private companies and Bare Escentuals management.

Plaintiffs allege the following untrue statements in connection with the March 2007 Registration Statement/Prospectus:

- once again, the statement that Bare Escentuals' customers "Exhibited brand loyalty and enthusiasm for its products" was false, since the direct to customer sales program started in 2001 was really the result of unwittingly joining customers as "club" sales members, without their consent;

- once again, the statement that the company's "multi-channel distribution strategy provided for greater consumer diversity reach and convenience while reinforcing the authenticity and premium image of the company's brands" was false, since the company was in reality selling to mass discounters like Costco and Target, thereby significantly undermining the company's reputation as a premium product seller;

- again, the statement that Bare Escentuals intended to "continue to increase net sales through key premium wholesale accounts" and that the company believed "that substantial opportunity exists to open additional domestic boutiques" was false, since Bare Escentuals was selling to Costco and Target— entities that were not "premium" department stores, since the company's premium sales opportunities were rapidly diminishing;

- the repeat statement that the company had to date "demonstrated success in cross-selling its non-foundation products" in certain sales channels was false, since in reality, Bare Escentuals' cross-selling efforts had failed;

- again, the statement that defendants planned to "further penetrate each of their multiple distribution channels" by increasing net sales to premium wholesale accounts and by expanding company-owned boutiques was false, since defendants instead engaged in a rampant expansion effort to chase immediate sales that resulted in the cannibalization of sales, instead of sales growth; and

- again, statements contained in Bare Escentuals' December 1998 agreement with QVC and the September 2006 written amendment to that agreement—which were attached to the SEC Statement/Prospectus—to the effect that QVC had the exclusive right to promote and sell Bare Escentuals products, were false, since Bare Escentuals was selling to Costco and Target.

*See* CCC, ¶¶ 72–81.

### iii. June 2007 Registration/Statement Prospectus

On May 14, 2007, Bare Escentuals filed with the SEC a Form S–1 Registration Statement and Prospectus ("June 2007 Offering Statement/Prospectus"). CCC, ¶ 82. After an additional amendment, the offering was priced and on June 14, 2007, Bare Escentuals, and certain selling stockholders, sold 8 million additional shares of its common stock at $36.50 per share. Bare Escentuals itself sold 100,000 new shares of stock, and the remaining 7.9 million shares were sold by Berkshire Partners, JH Partners, and other private companies and Bare Escentuals management.

Again, as with the IPO and the March 2007 Registration Statement/Prospectus, plaintiffs assert that the June 2007 Offering Statement/Prospectus contained untrue statements. Those allegedly misleading statements overlap with the statements identified above in connection with the IPO

and March 2007 Registration Statements/Prospectuses. The June 2007 Registration Statement/Prospectus also adds, however, the following two misrepresentations:

- the statement that the company's "chief executive officer, Leslie Blodgett . . . is supported by a senior management team with complementary experiences managing prestige cosmetic brands within retail and wholesale distribution channels and overseeing operations in the branded consumer products industry" was false, since in reality, only individual defendants McCormick and Miles were the other "senior management," and both were relatively new to Bare Escentuals; and

- the statement that the company "continued to experience strong consumer demand for" its products, and that its sales growth for each channel would be in line with growth rates for the three months ended April 1, 2007 compared to the three months ended April 2, 2006, "with the exception of the infomercial channel, which [was] expected to be flat relative to the same period for the prior fiscal year," was false. In reality, allege plaintiffs, the company's quarter 2 results for 2007 would reveal that the company's infomercials were not producing anywhere near their previously obtained level of sales, causing the company's stock price to plunge more than 40%. *See* CCC, ¶¶ 82–94.

iv. false and misleading class period statements

The class period commences on September 28, 2006. *See* CCC, ¶ 127. The class period allegations are stated only as to the Exchange Act claims, and deal specifically with the actions and statements of: individual defendants Blodgett, Miles and McCormick, as senior executive officers and/or directors of Bare Escentuals; and defendants Jones, Bloom, John, Hansen, and Ottinger (i.e., the "Individual defendants").

Plaintiffs allege numerous false and/or misleading statements made by defendants throughout the class period, the vast majority of which were made in connection with the company's press releases and financial reporting. Specifically, plaintiffs allege the following listing (in chronological order) of the differing bases for defendants' allegedly false statements:

- September 28, 2006 release relating to the IPO

- September 28, 2006 IPO Registration Statement/Prospectus

- November 7, 2006 press release re Q3 2006 financial results

- November 7, 2006 conference call involving Blodgett, Miles, and McCormick

- November 15, 2006 interim financial report for Q3 2006 on SEC Form 10–Q

- February 28, 2007 press release re financial results for Q4 and fiscal year ("FY") 2006

- March 30, 2007 annual financial report for FY06 and Q4 2006 on SEC Form 10–K

- March 13, 2007 press release re follow-on public offering of 12 million shares

- May 2, 2007 press release re financial results for Q1 2007

- conference call following May 2, 2007 press release involving Blodgett, Goldman Sachs

- May 14, 2007 interim financial report for Q1 2007 on SEC Form 10–Q

- June 5, 2007 press release re FY 2007 guidance

- June 13, 2007 press release re public offering of 8 million shares

- August 1, 2007 press release re Q2 2007 results
- August 14, 2007 interim financial report for Q2 2007 on SEC Form 10–Q
- statements made by Blodgett and McCormick at September 26, 2007 Piper Jaffray Second Annual London Consumer Conference
- October 31, 2007 press release re Q3 2007 financial results
- November 14, 2007 interim financial report for Q3 2007 on SEC Form 10–Q
- November 29, 2007 press release re fiscal 2007 and 2008 guidance
- January 30, 2008 press release entitled "Bare Escentuals, Inc. Named Hottest Prestige Makeup Brand of 2007"
- February 26, 2008 release re Q4 2007 and FY 2007 financial results
- February 28, 2008 annual financial report for Q4 2007 and FY 2007 on SEC 16 Form 10–K
- March 40, 2008 Goldman Sachs report entitled "Insider selling and PE distribution a lingering supply overhang"
- April 24, 2008 SunTrust Robinson Humphrey investment report re diversion of Bare products to Target stores
- April 24, 2008 Goldman Sachs statements re Bare's "sales per outlet growth" and "bottom up distribution model"
- May 1, 2008 release re Q1 2008 fiscal results
- May 1, 2008 statements to investors re Target and Costco sales disclosed during Q4 2007 earnings conference in Feb. 2008
- May 9, 2008 interim financial report for Q1 2008 on SEC Form 10–Q
- June 3, 2008 release re appointment of Michael Dadario as President of Retail
- July 30, 2008 release re Q2 2008 fiscal results
- August 8, 2008 interim financial report for Q1 2008 on SEC Form 10–Q

*See* CCC, ¶¶ 122–175.

## C. The Instant Action and Motion

Plaintiffs filed the instant action on July 17, 2009. The operative corrected consolidated complaint was filed on February 11, 2010. Plaintiffs' complaint asserts six claims against defendants: (1) violation of Section 11 of the Securities Act (against all defendants except Miles); (2) violation of Section 12(a)(2) of the Securities Act (against all defendants except Miles); (3) violation of Section 15 of the Securities Act (against the individual defendants except Miles); (4) violation of Section 10(b) of the Exchange Act and Rule 10b–5 Promulgated Thereunder (against Bare Escentuals and all individual defendants except Rose and Senk); (5) violation of Section 20(a) of the Exchange Act (against all individual defendants except Rose and Senk); and (6) violation of Section 20A of the Exchange Act (against individual defendants Blodgett, Ottinger, Senk, Bloom, Jones, Hansen, and John). *See generally* Complaint.

Defendants have now filed two motions to dismiss plaintiffs' claims. First, Bare and the individual defendants move to dismiss plaintiffs' claims on various grounds. They have filed a corresponding request for judicial notice in connection with the motion. Second, the underwriter defendants have filed their own motion to dismiss. Plaintiffs, besides filing a joint opposition to both motions, have also filed a motion to strike the request for judicial notice.

## DISCUSSION

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock,*

*Inc.,* 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8.

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specific facts are unnecessary—the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). All allegations of material fact are taken as true. *Id.* at 94. However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citations and quotations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See id.* at 558–59, 127 S.Ct. 1955. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n] that the pleader is entitled to relief." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir.2001). There are several exceptions to this rule. The court may consider a matter that is properly the subject of judicial notice, such as matters of public record. *Id.* at 689; *see also Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment). Additionally, the court may consider exhibits attached to the complaint, *see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989), and documents referenced by the complaint and accepted by all parties as authentic. *See Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002).

Finally, in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547–49 (9th Cir.1994).

### B. Bare and Individual Defendants' Motion to Dismiss

The Individual defendants, led by Bare, contend that the Corrected Consolidated Complaint must be dismissed because plaintiffs have failed to allege any viable claims against defendants under the Securities Act and the Securities Exchange Act. Specifically, defendants assert that: (1) plaintiffs fail to state a claim pursuant to Section 11 of the Securities Act; (2) plaintiffs fail to state a claim pursuant to

12(a)(2) of the Securities Act; (3) plaintiffs fail to state a claim pursuant to Section 10(b) of the Securities Exchange Act; (4) that plaintiffs' claims are barred by the applicable statutes of limitation; and (5) plaintiffs fail to state control person claims, or insider trading claims under applicable provisions of the Securities Act and Securities Exchange Act.

### 1. *Section 11 of the Securities Act*

The Individual defendants generally contend that plaintiffs have failed to assert a viable Section 11 claim, because plaintiffs have failed to satisfactorily allege any facts demonstrating that the IPO and/or March 2007 registration statements at issue—which form the predicate basis for plaintiffs' Securities Act claims—contained either material misstatements, or were fraudulent, pursuant to Rule 8(a) or alternatively, Rule 9(b) standards. Defendants also assert that plaintiffs have failed to adequately plead loss causation. Plaintiffs, in response, counter that their Section 11 claims do not "sound in fraud," thereby obviating any need for heightened scrutiny pursuant to Rule 9(b), and that the complaint's allegations are more than sufficient to plead actionable material misstatements under Rule 8(a). They also contend that loss causation is not an element of a claim asserted under Section 11, and so cannot form a basis upon which to dismiss plaintiffs' claims.

Resolution of these competing arguments requires analysis of the following issues: (a) the standards applicable to section 11 claims; (b) whether the claims "sound in fraud," thereby triggering the heightened pleading standards of Rule 9(b); (c) whether plaintiffs have sufficiently alleged material misstatements in connection with the IPO and March 2007 Registration Statements; and (d) whether the complaint fails to establish loss causation.

Preliminarily, however, the court must address defendants' requests for judicial notice filed in connection with the motion to dismiss, and plaintiffs' motion to strike in response thereto. Defendants, through an original and a supplemental request, seek an order judicially noticing a total of 53 exhibits—which exhibits consist of documents incorporated by reference into plaintiffs' complaint, Bare's SEC filings, certain press releases and conference call transcripts cited in the complaint, unrelated court filings, and Bare's website. Defendants seek the court's review of the content of these exhibits at various points in their arguments, in order to support their broader dismissal argument. Plaintiffs, however, object on grounds that it is impermissible at the pleading stage for the court to take judicial notice of facts that are substantively in dispute, and which go to the merits of plaintiffs' claims. In the event the court is inclined to grant defendants' judicial notice request, plaintiffs assert they need discovery in order to determine the probative value of the evidence.

 As plaintiffs themselves concede, while there is a general rule against referencing evidence outside the four corners of the complaint, an exception to the rule arises where a plaintiff references and relies on a particular document as part of the moving allegations of the complaint. In such cases, the court is justified in looking outside the four corners of the complaint, to the document itself if offered. *See, e.g., Twombly,* 550 U.S. at 569 n. 13, 127 S.Ct. 1955 ("the District Court [is] entitled to take notice of the full contents of the published articles referenced in the complaint, from which [ ] truncated quotations [are] drawn."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily ex-

amine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"). The court is also permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC, as well as of press releases and conference call transcripts cited in the complaint containing alleged "safe harbor" warnings. *See Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 fn. 2 (9th Cir.2006); *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 864 (N.D.Cal.2004) (judicial notice of such press releases proper). Moreover, the court may take judicial notice of the existence of unrelated court documents, although it will not take judicial notice of such documents for the truth of the matter asserted therein.

Thus, to the extent defendants seek judicial notice of exhibits that are referenced and relied upon in plaintiffs' complaint, as well as SEC filings, press releases and conference call transcripts cited in the complaint, and unrelated court documents the court will consider these exhibits and GRANTS defendants' request. However, where inappropriate, the court will not consider these documents for the truth of the matters asserted therein. In addition, the court DENIES defendants' request for judicial notice, to the extent defendants request that the court take judicial notice of Bare's sales policy, as posted at an undisclosed date on Bare's website.[2]

For the same reasons, plaintiffs' motion to strike defendants' requests for judicial notice is also GRANTED in part and DENIED in part.

The court now turns to the issues for review in connection with plaintiffs' section 11 claims.

### a. standards applicable to Section 11 claims

▬ Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a registration statement may sue based on material omissions or misrepresentations in that statement. 15 U.S.C. § 77k(a). Persons liable under § 11(a) are those who signed the registration statement, directors of or partners in the issuer, professionals who participated in the preparation of the registration statement, and underwriters of the security. *Id.* To plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an omission or misrepresentation, and that the omission or misrepresentation was material—that is, that it would have misled a reasonable investor about the nature of his or her investment. *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir.1996).

### b. whether plaintiffs' claims "sound in fraud"

Defendants argue that Rule 9(b) applies to plaintiffs' Section 11 claim because the complaint's allegations are "predicated on fraud." In support of its arguments regarding the applicability of Rule 9(b), defendants note that plaintiffs' complaint utilizes the same alleged misrepresentations and omissions in support of their section 11 claim as those used to support their Section 10(b) claims—which do require heightened pleading. Defendants accordingly contend that all elements of the section 11 claim must be stated with particularity, including the time, date, place, content of the alleged fraudulent

---

**2.** It should be noted that plaintiffs have also filed a request for judicial notice, requesting that the court take judicial notice of certain unrelated court filings. Defendants have not opposed the request, and for the reasons enunciated above, the court accordingly GRANTS plaintiffs' request for judicial notice.

representation, and how and why the representation was false or misleading.

Plaintiffs counter that the heightened pleading standards of Rule 9(b) apply only if the plaintiff alleges a "unified course of fraudulent conduct." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir.2005). Here, however, they assert that they describe only a unified course of self-cannibalizing sales operations, premium product image dilution through sales to big-box discounters, failing efforts to revitalize the infomercial sales and to cross-sell, and heavy reliance on the negative option club program. Plaintiffs contend that these are not fraudulent practices in and of themselves, and to the extent the plaintiffs seek to hold defendants responsible for statements related to these practices, plaintiffs expressly disclaim fraud, and insist that they claim only that defendants were negligent in failing to adhere to their duties to "speak the whole truth," once they had undertaken to speak some truth. Accordingly, conclude plaintiffs, Rule 9(b) standards do not apply.

■ To ascertain whether a complaint "sounds in fraud," the court must normally determine, after a close examination of the language and structure of the complaint, whether the complaint "allege[s] a unified course of fraudulent conduct" and "rel[ies] entirely on that course of conduct as the basis of a claim." *See Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir.2003). Where, however, a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, the court "can assume that it sounds in fraud." *See Daou*, 411 F.3d at 1028; *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir.2009).

■ This case presents an instance of the latter. As defendants point out, there is a remarkable similarity between the conduct forming the basis for plaintiffs' section 11 claims, and the conduct forming a basis for plaintiffs' section 10(b) claims. For example, the court sees an obvious overlap between paragraphs 59, 62–63, 66–67, 73–74, and 80 (i.e., Section 11 allegations), and paragraphs 105–06, 108, 115, 117, 128 (section 10(b) allegations). The principal difference between the former and the latter is that plaintiffs expressly state that the former allegations disclaim fraud as a basis, and the latter allegations reflect the use of terminology that is more consistent with so-called 'fraudulent' behavior—i.e., include stronger references to defendants' 'concealment' in connection with the latter allegations.

As defendants correctly note, however, it is the conduct pled that matters—not necessarily the words with which plaintiffs artfully seek to allege their claims. And since the course of conduct pled in connection with plaintiffs' section 11 claim is so substantively similar to the conduct pled in connection with plaintiffs' section 10(b) claim—at least with respect to all statements contained within the IPO and March 2007 Registration statements—the court concludes that plaintiffs' section 11 claims do, in fact, "sound in fraud."

As such, the heightened pleading requirements of Rule 9(b) apply, and to survive dismissal, the court must conclude that plaintiffs have demonstrated *with particularity* in accordance with Rule 9(b) that: (1) the registration statements contained an omission or misrepresentation; and (2) and that the omission or misrepresentation was material—that is, that it would have misled a reasonable investor about the nature of his or her investment. *In re Stac Electronics*, 89 F.3d at 1403–04.

#### c. material misstatements in connection with the IPO and March 2007 Registration Statements

■ With this understanding in mind, the court turns to the heart of plaintiffs'

section 11 claim—whether plaintiffs have adequately alleged a material misstatement in connection with the IPO and/or March 2007 registration statements. The parties focus on the following alleged material misstatements: (i) those concerning Bare's adherence to "premium" sales restrictions; (ii) those concerning the success of Bare's "club" program (i.e., negative option sales program); (iii) those concerning Bare's efforts to cross-sell its non-foundation products; and (iv) those concerning Bare's store expansion, and the resulting alleged "cannibalization" of sales caused by the expansion.

### i. Bare's adherence to "premium" sales restrictions

Plaintiffs allege that Bare's IPO and March 2007 statements/prospectuses misstated Bare's adherence to its "premium sales" restrictions. Specifically, plaintiffs allege: that the statements/prospectuses stated that Bare's "multi-channel distribution strategy" provided for "greater consumer diversity, reach and convenience while reinforcing the authenticity and premium image of the Company's brands;" but that in reality, the company was selling its product to foreign distributors that had begun reselling Bare products to mass discounters like Costco and Target, thereby undermining the company's reputation as a "premium" product seller; that the statements/prospectuses also stated that the company was in compliance with an exclusive rights agreement with QVC, whereby QVC had the exclusive right to promote, market and sell Bare products in all distribution channels, but only in "premium" channels; and that notwithstanding this assertion, Bare was not in compliance with the agreement with QVC at the time these statements were made, since it was redistributing its products to Costco and Target. *See* CCC, ¶¶ 63, 65–67, 74, 79–80.

Ultimately, the court finds that these allegations fail to meet Rule 8's pleading requirements, let alone Rule 9(b)'s. When viewed as a whole, the allegations do not exceed *Twombly's* 'plausibility' threshold. The gist of plaintiffs' allegations, for example, are premised on Bare's sale of products to big-box discounters Target and Costco. Yet, in their complaint, plaintiffs simultaneously allege that Bare filed litigation in federal court *against* Costco, on grounds that Costco was harming Bare with Costco's "unauthorized" actions and sales. *See* CCC, ¶ 12. It is strains credulity to infer that Bare would have been selling its products to Costco, in violation of the Company's existing agreement with QVC, while also prosecuting litigation against Costco for its unauthorized sale of Bare goods.

Similarly, plaintiffs allege that defendants "knew" at some point before the Fall of 2007 that its products were being sold on Target's website, but plaintiffs do not actually allege—though they want the court to infer as much—that Bare was the entity doing the selling to Target. Plaintiffs seek to overcome this hurdle by alleging that the former Director of Production during the February/March 2007 and February/March 2008 periods recalled working on fulfilling a large special order, and that he "believed" this order ended up on Target's shelves. But this allegations is far too vague to meet Rule 9(b)'s heightened pleading requirements.

In short, plaintiffs' allegations fail to establish, consistent with both Rule 8 and Rule 9(b) pleading standards, that defendants' IPO and March 2007 statements/prospectuses materially misstated Bare's adherence to "premium sales" restrictions.

### ii. Bare's "club" program statements

Plaintiffs also allege that Bare's IPO and March 2007 statements/prospectuses concealed Bare's reliance on its "club" (i.e., negative option sales) program. Specifi-

cally, plaintiffs allege: that Bare utilized its club program to capture, obtain, and report several years' worth of phenomenal premium sales" leading up to the September 2006 IPO; that these club sales would grow lean in the period following the IPO and the follow-on offerings; that the company would be forced to refund previously recognized sales, and many direct to consumer sales customers became brick and mortar shoppers instead; that in the two years following the IPO, the company's direct to consumer sales plummeted; and that the registration statements and prospectuses not only failed to disclose the impact the club practices were having on sales, but also falsely described Bare's infomercial program as offering "competitive" strengths that generated "brand loyalty and enthusiasm" for Bare's products. *See* CCC, ¶¶ 59, 62, 73.

These allegations too are insufficient to satisfy the heightened pleading requirements of Rule 9(b). Plaintiffs do not adequately support with any detailed factual allegations their claim that Bare's statements regarding the "competitive strength" of its programs or the "brand loyalty and enthusiasm" generated for Bare products, were actual misstatements. For example, plaintiffs do not allege how many customers were members of the club program, nor do they allege any facts objectively supporting the allegation that the club program was actually performing poorly. While plaintiffs do offer two confidential witnesses who purportedly testify as to customer dissatisfaction with the club program, *see* CCC ¶ 18, these witnesses confirm only the fact of certain ongoing customer complaints, without any specifics that would enable the court to ascertain whether the club's performance as a whole was so unsuccessful as to support plaintiffs' claim of misrepresentation. Plaintiffs do allege that in the two years following Bare's IPO, "the Company's so-called direct-to-consumer sales plummeted from

$179 million in FY 2006, representing 45.6% of all sales, to $170 million in FY 2008, representing just 30.6% of all sales." *Id.,* ¶¶ 18–19. However, this alleged decline is not sufficient, on its own, to support plaintiffs' claim that Bare's sales were lost as a consequence of the poor performance of the club program.

To the extent, moreover, that plaintiffs, in their opposition brief and at the hearing on this matter, urged the court to discern the failing nature of Bare's club sales from an unrelated case filing in the Northern District between Bare and a third party named Intelligent Beauty, the court declines to do so. The court may not take judicial notice of the substance of that unrelated complaint, for the truth of any matter asserted within that complaint.

In sum, the court agrees with defendants that plaintiffs' allegations fail to adequately establish that Bare's IPO and March 2007 statements/prospectuses improperly concealed Bare's reliance on its "club" program, as well as the negative effect of the club program on Bare's sales.

### iii. Bare's efforts to "cross-sell" its non-foundation products

Next, plaintiffs allege that Bare's IPO and March 2007 statements/prospectuses included the following representation: that the company planned to "leverage its strong market position in foundation to cross-sell its other products," and that "to date, the company had demonstrated success in cross-selling its non-foundation products." These representations were misstatements, say plaintiffs, because in reality, Bare's cross-selling efforts had failed, as shown by the allegation that Bare's President of Retail stated on October 30, 2008, that the company had previously "tried and failed" to cross-sell its products and "broaden its offerings into related cosmetic categories." *See* CCC, ¶¶ 68, 76, 197.

These allegations do not suffice to state with particularity a material misstatement by defendants. While the time, date, place and content of the affirmative representation may be inferred from the allegation that the misstatements were contained within Bare's IPO and March 2007 registration statements/prospectuses, plaintiffs do not allege how or why the statements were wrong, and/or material, as conveyed at the time of the IPO and March 2007 registration statements/prospectuses. In particular, plaintiffs rely on an October 30, 2008 concession conveyed by a Bare executive in a third party analyst report stating the Company had previously "tried and failed" with respect to strategies "similar" to the Company's attempt to broaden its offerings into related cosmetics categories, in order to demonstrate that the company's statements on its *September 2006* and *March 2007* statements/prospectuses were misstatements. *See* CCC, ¶ 179. Without more—and in view of the fact that the actual IPO and March 2007 registration statements themselves actually state that the Company had experienced success in cross-selling blush, eye makeup and lip products in boutiques and on home shopping television—plaintiffs have failed to plausibly allege that the company's representation about its cross-selling success in 2006 and 2007 was a misrepresentation, let alone a material one. *See, e.g.*, Declaration of Molly Arico ISP Mot. to Dismiss ("Arico Decl."), Ex. 11 at 3.

And since there are no other allegations to demonstrate the falsity of the purported misrepresentation, the allegations plainly fail.

### iv. Bare's cannibalization of sales caused by its store expansion

Plaintiffs allege that Bare's IPO and March 2007 Registration Statements/Prospectuses contained the following material misstatements: that defendants planned to "further penetrate each of their multiple distribution channels" through a "wholesale" and "retail" approach; and that with respect to the retail approach, defendants believed "substantial opportunity exists to open additional domestic Boutiques." *See* CCC, ¶¶ 59–61, 75, 77–78. According to plaintiffs, these were misstatements because defendants were engaged in a "rampant expansion effort to chase immediate sales at all costs," and that this resulted in Bare opening "over 750" brick and mortar sales channels, without any efforts being made "to coordinate the multiple competing sales spots that were popping up." *See id.*, ¶ 61. According to plaintiffs, this resulted in the cannibalization, rather than the growing, of "infomercial sales." *Id.*

These allegations are not sufficient to plead a material misstatement with particularity. Again, while the time, date, place and content of the affirmative representation may be inferred from the allegation that the misstatements were contained within Bare's IPO and March 2007 registration statements/prospectuses, plaintiffs fail to allege how the purported misstatements were misleading. Plaintiffs only conclusorily allege, for example, that Bare's so-called expansion efforts led to the cannibalization of Bare's infomercial sales. They provide no supporting facts that lead concrete credence to the conclusion that unexpected "cannibalization" of Bare's infomercial sales channels resulted from Bare's expansion of boutiques. Moreover, as defendants counter, plaintiffs' allegations with respect to the cannibalization caused by Bare's purportedly too-quick expansion test the plausibility threshold. Bare reported sales growth for 2006, 2007 and the first half of 2008. *See* CCC, ¶¶ 135, 157, 173; Arico Decl., Exs. 4, 6 at 67, 13. Indeed, Bare's so-called "rampant expansion" of brick and mortar stores is itself an indication of successful growth and the truth of Bare's representa-

tion that it sought to further penetrate a distribution channel that would encompass the growth of additional domestic Boutiques.

In sum, plaintiffs' allegations belie their claim that defendants' expressed desire to increase growth through wholesale and retail approaches—including the creation of additional domestic boutiques—was demonstrably wrong when expressed. Plaintiffs base defendants' alleged misrepresentations to this effect on the fact that Bare was actually increasing its brick and mortar expansion at the expense of its infomercial sales, but provide no logical link as to why this would be the case, let alone any supporting allegations that would detail how this is the case.

Thus, the requisite degree of particularity is lacking.

\* \* \*

In sum, defendants' motion to dismiss plaintiffs' Section 11 claim, based on the foregoing grounds, is GRANTED.

### d. loss causation

██ Finally, defendants contend that plaintiffs fail to allege adequate loss causation. The Ninth Circuit has held, with respect to loss causation, that "plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou*, 411 F.3d at 1025. However, as defendants concede, loss causation is not an element of a section 11 claim; rather, it is an affirmative defense. Moreover, a "plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *Id.* "As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages." *Id.*

Defendants argue that dismissal is warranted, notwithstanding that loss causation is an affirmative defense, because the face of the complaint is so lacking in any connection whatsoever between the alleged misrepresentation and plaintiffs' losses. The court, however, finds that plaintiffs have generally alleged that they suffered injury from the hit their stock took once it was understood that defendants' myriad misrepresentations had contributed to an over-inflation of stock. At this stage, this allegation is sufficient to pass muster.

The court accordingly DENIES defendants' motion to dismiss on this alternative and additional ground.

### 2. *Section 12(a)(2) of the Securities Act*

Defendants contend that plaintiffs' complaint fails to state a claim under Section 12(a)(2) of the Securities Act, given their failure to satisfactorily allege a section 11 claim. Defendants also contend that plaintiffs' Section 12(a)(2) claim fails because neither Bare nor the individual defendants who sold stock during the offerings were "sellers" of securities under the statute, since the IPO and March 2007 offerings were "firm commitment" underwritten offerings. Plaintiffs, by contrast, respond that the court should reject defendants' argument that they are not § 12(a)(2) "sellers," because defendants' combined actions clearly establish "solicitor seller" status. Specifically, plaintiffs point to their allegations that the individual defendants actively met with potential investors to present highly favorable information about the company and its sales model; that the defendants were motivated to solicit purchasers; and that they reaped millions of dollars from the company's offerings.

 Section 12(a)(2) of the 1933 Securities Act imposes civil liability on any person for use of any instrumentality of

interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ....". *See* 15 U.S.C. § 77*l* (a)(2). To establish liability under section 12(a)(2), a plaintiff must prove that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain. *See In re Daou Systems, Inc.,* 411 F.3d at 1029. A person is a statutory seller, or sells securities, if he or she either passes title of the security to the purchaser, *or* solicits the sale of the security. *See Pinter v. Dahl,* 486 U.S. 622, 646–648, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

Defendants are correct that plaintiffs' claim fails in the first instance, because—as already discussed in the preceding sections—they have failed to allege, as a predicate, the existence of material misstatements and/or omissions in connection with the IPO and March 2007 registration statements/prospectuses. For this reason, therefore, dismissal of plaintiffs' section 12(a)(2) claim is warranted.

■ Defendants are also ultimately correct that the claim must be dismissed for plaintiffs' failure to satisfactorily plead that either Bare or the individual defendants who sold in the offerings were "sellers" of securities, as contemplated by Section 12(a)(2). To be sure, defendants' argument that the IPO and March 2007 offerings' status as "firm commitment" underwritten offerings prohibits defendants from qualifying as statutory "sellers," is not wholly convincing. As at least one district court has persuasively noted, "a firm commitment offering does not mean that only the underwriters sell-

ing the security may be sued, and that those involved in preparing the registration statement cannot be liable. In a firm commitment offering, officers of the company issuing the registration statement may not be held liable as "sellers" under section 12(2) "unless they actively 'solicited' the Plaintiffs' purchase of securities to further their own financial motives ...".". *See In re Stratosphere Corp. Securities Litig.,* 1 F.Supp.2d 1096, 1120 (D.Nev.1998). Thus, the court's inquiry must center on whether plaintiffs have adequately alleged active solicitation on defendants' part.

However, a "mere assertion that defendants are solicitors or sellers is a legal conclusion and therefore insufficient to withstand a motion to dismiss." *See, e.g., Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216 (1st Cir.1996) (superceded in part by PSLRA); *In re Westinghouse Securities Litig.,* 90 F.3d 696, 717 (3d Cir. 1996). Something more is needed. And it is this something more that plaintiffs have not provided. In support of their conclusion that defendants qualify as "sellers," plaintiffs rely on paragraphs 38–47, 56, 29, 71, 72, and 81. These paragraphs, however, fail to set forth with any degree of detail the means by which defendants actively solicited plaintiffs' purchase of securities. Rather, they allege via conclusory statements what defendants stood to gain, and what defendants reaped as a consequence of the sale. They do not set forth the actual efforts made to seek or solicit a purchase of securities.

In sum, defendants' motion to dismiss plaintiffs' claim pursuant to Section 12(a)(2) of the Securities Act is GRANTED.

3. *Section 10(b) of the Securities Exchange Act*

Defendants also contend that plaintiffs' complaint fails to state a valid claim under

Section 10(b) of the Securities Exchange Act. Plaintiffs' claim is premised on the fraudulent statements purportedly made by defendants in connection with the IPO and March 2007 registration statements, as well as numerous other public statements made during the class period. Defendants generally assert that plaintiffs have failed to plead facts sufficient to establish either of the requisite elements of falsity, or scienter. At any rate, defendants argue, the Company's forward-looking statements are protected by the safe harbor and the 'bespeaks caution' doctrine. Plaintiffs, naturally, respond that the allegations of their complaint are more than adequate to establish falsity, and to raise a strong inference of scienter. Furthermore, plaintiffs counter that defendants cannot escape liability for their false and misleading statements by invoking any safe harbor provision or "bespeaks caution" doctrine.

As with plaintiffs' Section 11 claim, the arguments raised by the parties in connection with plaintiffs' Section 10(b) claim require a straightforward analysis. In short, the court's analysis depends upon discussion and resolution of the following issues: (a) the standards applicable to section 10(b) claims; (b) whether plaintiffs plead claims satisfying the 'falsity' element; (c) whether plaintiffs plead facts satisfying the 'scienter' element; and (d) whether defendants' forward-looking statements are protected by the safe harbor/'bespeaks caution' doctrine.

### a. standards applicable to section 10(b) claims

■ To plead securities fraud under Section 10(b) of the 1934 Act or Rule 10b–5, plaintiffs must allege (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which plaintiffs relied; (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir.2002). A presumption of reliance is available to plaintiffs alleging violations of § 10(b) based primarily on omissions of material fact, but not in cases alleging significant misrepresentations in addition to omissions, or alleging only misrepresentations. *Binder v. Gillespie*, 184 F.3d 1059, 1063–64 (9th Cir.1999). A presumption of reliance is also available in a "fraud on the market" case, where the plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market." *Id.* at 1064 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.'" *In re Silicon Graphics*, 183 F.3d 970, 988 (9th Cir.1999). The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002). If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

■ Under the PSLRA—whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"—the complaint must now specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on in-

formation and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1).[3] If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *In re Vantive*, 283 F.3d at 1085; *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

In addition—whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact"—the complaint must now, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also In re Vantive*, 283 F.3d at 1084. By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).

■■ In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." *In re Silicon Graphics*, 183 F.3d at 979. If the challenged act is a forward-looking statement, the required state of mind is "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1); *see No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir.2003). Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth

Circuit has incorporated the falsity and scienter requirements into a single inquiry. *Id.* at 932. While the court must take the totality of the allegations into account when considering whether the heightened pleading standard has been met, *see America West*, 320 F.3d at 945, the complaint must continue to comply with the *Silicon Graphics* standards in order to state a claim. *In re Read–Rite*, 335 F.3d 843, 846 (9th Cir.2003).

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897 (noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA"). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. *Id.*

#### b. the 'falsity' element

■■ Defendants substantively challenge plaintiffs' ability to adequately allege falsity. Plaintiffs allege numerous material misrepresentations and omissions by defendants, based on defendants' purported statements made in connection with various conference calls, financial press releases, and SEC statements from September 2006 through October 2008.[4] Plaintiffs

---

3. Matters that are not alleged on personal knowledge are considered to be alleged on information and belief. *See In re Vantive*, 283 F.3d at 1085 n. 3.

4. To the extent plaintiffs seek to allege falsity in connection with Bare's statements regarding its multi-channel distribution model and growth strategy (i.e., cross-selling and canni-

balization of sales via rapid expansion), brand loyalty and club sales program, and premium image dilution, defendants contend—and are correct—that the same reasons for dismissing plaintiffs' Section 11 claim, also apply here, and warrant dismissal of plaintiffs' Section 10(b) claim on falsity grounds. Thus, the court as a preliminary matter GRANTS defendants motion to dismiss plaintiffs' 10(b)

base their claim of falsity on allegations that defendants group into the following categories: (1) Bare's business model was not performing well, rendering Bare's financial guidance "meaningless;" (2) Bare's infomercials were "not performing" and new infomercials had caused declines in sales; (3) Bare's wholesale channels had problems; and (4) the international markets were failing. *See, e.g.,* CCC, ¶¶ 112, 134(a)-(k).

Defendants assert that plaintiffs' allegations fall short of Rule 9(b)'s heightened pleading requirements. First, defendants argue that a review of the financial reports cited by plaintiffs discloses that Bare actually exceeded its financial guidance numerous times, and only reduced its guidance in July and October 2008 in response to the deepening recession—thus giving the lie to plaintiffs' allegation that Bare's business model was not performing well and that its stated financial guidance was "meaningless". *See* CCC, ¶¶ 129, 135–36, 140–41, 155, 173, 195; *see* Arico Decl., Exs. 3–5, 7–8. Second, defendants note plaintiffs' failure to plead facts that actually show that Bare knew the performance of its infomercials would be disappointing, and that to the extent defendant Blodgett said she was "excited" about an upcoming infomercial in May 2007, this was non-actionable puffery. *See In re Foundry Networks, Inc. Sec. Litig.,* 2003 WL 22077729 (N.D.Cal. Aug. 29, 2003). Third, defendants contend that Bare's wholesale channels were actually doing well, based on the performance reflected in the financial reports cited by plaintiffs in their complaint, and also that plaintiffs fail to plead facts showing that Bare somehow knew that its premium wholesale partners would reduce inventory levels while claiming the opposite. Finally, defendants argue that Bare's international expansion efforts actually proved successful, as demonstrated by the per-

formance records contained within the financial reports cited by plaintiffs in their complaint. *See* Mot. Dismiss at 19:3–23:11.

In opposition, however, plaintiffs do not substantively respond to the majority of defendants' arguments. Rather, plaintiffs merely counter that it would be "impossible to meaningfully summarize the 100+ page complaint here in order to outline every class period misstatement." *See* Op. Br. at 10–16. By failing to at least meaningfully summarize and combat the various categories of statements highlighted by defendants, however, plaintiffs have essentially abdicated their responsibility to rebut defendants' dismissal arguments, and conceded the point.

Plaintiffs do counter defendants' arguments with respect to the performance of Bare's "infomercials" specifically, relying on paragraphs 60, 75, 77, and 86 and 90, for the proposition that Bare believed in the growth continuity of the infomercial sales channel—thereby purportedly demonstrating the falsity of such statements in light of the infomercials' declining performance and declining sales. *See* Opp. Br. at 34:23–35:6. Critically, however, plaintiffs completely fail to set forth any particularized allegations that would demonstrate 'how' or 'why' defendants' alleged statements relating to Bare's infomercial program were false when made. Plaintiffs have essentially alleged that, while defendants stated their "belief" in the growth of Bare's infomercial and online shopping sales, the reality reflected something different, since infomercial sales were actually diminishing as a result, for example, of defendants' rapid expansion into brick and mortar sales channels. *See, e.g.,* ¶ 75, 77–78. These allegations do nothing to establish that defendants' statements regarding the growth of its infomercial programs

claim, to the extent premised on these same allegations.

were false *when made,* however. In short, plaintiffs fail to plead the falsity of Bare's statements in connection with its infomercial program, with sufficient particularity.

Moreover, because plaintiffs do not bother to address any of the other three categories of allegedly material misstatements and/or omissions highlighted by defendants, plaintiffs have also failed to discharge their burden to successfully rebut defendants' well-supported arguments.

All of which warrants DISMISSAL of plaintiffs' section 10(b) claim, for failure to allege defendants' purported misstatements with particularity.

### c. the 'scienter' element

Even if failure to plead falsity did not provide a basis for dismissal, plaintiffs' failure to allege scienter ultimately would. "In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), [the court] must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements." *America West,* 320 F.3d at 932. To determine whether a plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *See Tellabs, Inc.,* 551 U.S. at 323, 127 S.Ct. 2499.

■■■ Plaintiffs generally contend that they adequately allege scienter by virtue of: (i) core operation allegations; (ii) unusual stock sales; and (iii) corroboration of confidential witnesses. Ultimately, however, none of these are sufficient.

### i. core operation allegations

Plaintiffs argue that each individual defendant's role as a "key player" in Bare's internal operations helps satisfy the scienter requirement with respect to misrepresentations regarding Bare's infomercial business. Specifically, plaintiffs allege that each defendant knew of the performance of various sales channels and was intimately involved in and fully aware of actual reports regarding sales through all channels." *See, e.g.,* CCC, ¶¶ 38–45. This is proof of scienter, argue plaintiffs, with respect to the company's misrepresentations regarding the "infomercial" sales channel as an avenue of growth for the company.

■■■ As defendants point out, however, plaintiffs rely too broadly on a very narrow exception to the scienter requirement. As a general rule, complaints alleging that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers" are found inadequate. *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir.2009). However, a narrow exception exists when (a) falsity is combined with "allegations regarding a management's role in the company" that are "particular and suggest that the defendant had actual access to the disputed information," and where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter;" and (b) where the information misrepresented is readily apparent to the defendant corporation's senior management. *See id.* at 1000–01. Here, plaintiffs appear to be relying on the latter category of exemption. But, as defendants point out, under this exemption, "reporting false information will only be indicative of scienter where the falsity is patently obvious"—i.e., where the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* And here, plaintiffs fail to allege especially promi-

nent facts. Rather, they charge that Bare misstated its belief that it could "further penetrate" its multiple distribution channels, including growing infomercial sales." *See* CCC, ¶¶ 38–39, 41–45, 60, 75–77. But as noted previously, there are insufficient facts to detail the falsity of this claim with particularity—let alone to establish that the falsity was "patently obvious."

Thus, plaintiffs cannot utilize the 'core operations' exemption here to show scienter with respect to purported misrepresentations surrounding Bare's infomercial program. Plaintiffs have not attempted to utilize the exemption to show scienter in connection with other categories of misrepresentations.

### ii. unusual stock sales

Plaintiffs argue that stock sales by several defendants are indicative of scienter. As defendants note, however, the only defendants who really sold stock were Bare officers Blodgett and McCormick, and Bare directors John and Ottinger. Blodgett sold stock in the March/June 2007 offerings, and sold 18.9% and 8.21% respectively; McCormick sold stock in the June 2007 offering, and sold 6.66% of his stock; John sold 14.5% of his holdings in February 2008, pursuant to a 10b–5 trading plan; and Ottinger sold stock in the March/June 2007 offerings, and sold 17.0% and 8.14%, respectively. *See* CCC, ¶¶ 38–39, 44–45, 72, 82, 248.

■ Generally, the PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard." *In re Daou Sys.,* 411 F.3d at 1022 (citation and quotation omitted). Stock trades are only suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics,* 183 F.3d at 986. To evaluate

suspiciousness of stock sales, the court should consider the amount and percentage of shares sold, the timing of the sales, and whether the sales were consistent with prior trading history. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir.2004).

Here, only 4 of the 10 individual defendants sold stock during the class period. And not all of these 4 defendants are alleged to have made false and or misleading statements. Moreover, no defendant sold more than 20% of their stock at any given time. Furthermore, while plaintiffs are correct that the amounts of stock sold are alleged to have generated extraordinarily large sums for the defendants—e.g., $58 million for Blodgett and $700 million for McCormick—they do not suggest that there was anything especially problematic with the timing of the sales, since the stock was sold before final and favorable results for 2007 were reported.

In short, the court does not find the stock sales, without more, by several of the Individual defendants to be probative of scienter.

### iii. corroboration of confidential witnesses

■ Plaintiffs also point to the testimony of confidential witnesses in order to establish scienter. *See* CCC, ¶¶ 13–14, 15, 17, 114. Confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. *In re Daou,* 411 F.3d at 1015–16. In addition, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter. *See id.* at 1022. 1022.

Here, plaintiffs' confidential witness testimony, as alleged in the complaint, falls short of the standard needed to raise an

inference of scienter. First, as defendants contend, plaintiffs have failed to offer any confidential witness information concerning six of the eight Individual defendants—defendants Blodgett, Ottinger, Jones, Bloom, Hansen, and John. Since there is no allegation that any confidential witness "had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period," there is simply no basis from which to infer scienter with respect to these six defendants.

Second, with respect to the remaining two witnesses—defendants McCormick and Miles—plaintiffs' confidential witness testimony consists of the following: testimony by a former Director of Retail Boutiques, to the effect that approximately 30 executives attended monthly meetings conducted by defendant McCormick, and sometimes defendant Miles, at which the issue of sales at Target and Costco was common knowledge and raised regularly. *See* CCC, ¶¶ 17, 114. There is no allegation that either defendant Miles or McCormick raised the issue themselves, nor is there any indication that either defendant in any way knew, as plaintiffs charge, that Bare was intentionally shipping company goods to big-box discounters while deliberately disclaiming any involvement in such sales. To the contrary, plaintiffs have alleged that "McCormick assured the sales Directors the Company "was looking into" the situation—an allegation that could just as easily support defendants' innocence, as their culpability. *Id.,* ¶ 114.

In sum, plaintiffs' isolated confidential witness statements fail to create an infer-

ence of scienter more cogent or compelling than an alternative innocent inference.

\* \* \*

The court therefore GRANTS defendants' motion to dismiss, for failure to adequately allege scienter.

### d. safe harbor/'bespeaks caution' doctrine

█ Finally, defendants assert that many of the alleged misstatements pled by plaintiffs during the class period are non-actionable, pursuant to the 'bespeaks caution' doctrine. In essence, defendants argue that the alleged misstatements were accompanied by meaningful cautionary language, such as to render any claim of fraudulent misstatement not actionable. Plaintiffs, in response, contend that rote cautionary language such as that contained in the statements highlighted by defendants, cannot counter the alleged misstatements made by defendants at the dismissal stage.[5]

Defendants have specifically and adequately highlighted the following instances of defendants' alleged forward-looking statements: defendants' press releases and/or conference statements dated November 7, 2006, February 28, 2007, May 2, 2007, June 5, 2007, August 1, 2007, September 26, 2007, October 31, 2007, November 29, 2007, February 26, 2008, March 1, 2008, and July 30 2008. *See* CCC, ¶¶ 129, 131–32, 135–36, 140–42, 145, 148, 151–52, 155, 157–58, 167, and 173. As alleged by plaintiffs, on each of these instances, defendants provided future projections with regard to the Company's financial guidance and/or general future expenditures. As such, defendants' projections easily

---

5. While the court would not normally find it necessary to reach this ground in view of plaintiffs' difficulties in establishing both falsity and scienter, the court nonetheless address-

es defendants' arguments here in order to provide the parties with a thorough analysis of all arguments made.

meet the definition of a forward-looking statement. *See* 15 U.S.C. § 78u–5(i)(1)(A).

Defendants' projections and forward-looking statements are inactionable under the PSLRA's safe harbor and the 'bespeaks caution' doctrine, provided they are accompanied by meaningful cautionary language. *See, e.g., Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1133–34 (9th Cir.2004). This is so here, with respect to at least some of defendants' forward-looking statements.

Specifically, defendants have established that meaningful cautionary language accompanied defendants' forward-looking statements in connection with the Company's releases and/or conferences dated November 7, 2006; February 28, 2007; May 2, 2007; June 5, 2007; August 1, 2007; October 31, 2007; November 29, 2007; and February 26, 2008. *See* CCC, ¶¶ 131–32, 180–82, 184, 188; *see also* Arico Decl., Exs. 3–5, 13–14, 27, 29–30, 37–39, 40–41. Moreover, defendants have also correctly noted that defendants' Form 10–Ks—which investors were also directed to in connection with the foregoing instances of cautionary language—additionally included meaningful cautionary language. *See, e.g.,* Arico Decl., Exs. 1–2, 6.

█ All of which renders defendants' forward-looking statements inactionable. Plaintiffs oppose such a finding on grounds that the cautionary language relied on by defendants is too "generic" to support invocation of the 'bespeaks caution' doctrine at the pleading stage. However, the court is unpersuaded, and finds that defendants' cautionary language is sufficiently specific so as to support application of the doctrine in the foregoing instances. Furthermore, even if unaccompanied by cautionary language, forward-looking statements cannot support liability unless they are made with actual knowledge of their falsity. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). And as already explained, plaintiffs have not plead with particularity Defendants' actual knowledge of falsity in any event.

Thus, defendants' motion to dismiss is GRANTED, with respect to the forward-looking statements accompanied by meaningful cautionary language, as highlighted herein.

### 4. *Whether Plaintiffs' Claims are Time–Barred*

The Bare defendants also argue that plaintiffs' claims under both the Securities Act and the Exchange Act are untimely, and barred by the relevant statute of limitations. Defendants' arguments, which are sparse, contend that paragraphs 203 and 205–06 of the complaint disclose that "the nature and extent of the defendants' fraud" was "revealed to investors and the market" on June 5, 2007, and again on August 1, October 31, and November 26, 2007. Thus, the one year limitations period that applies to Securities Act claims expired on June 5, 2008, and the two-year limitations period that applies to Exchange Act claims expired on June 5, 2009—well before the July 2009 filing of plaintiffs' complaint. At a minimum, defendants contend that the limitations period began to run on February 26, 2008, when Bare publicly disclosed the existence of the Target/Costco sales. Plaintiffs, in response, contend that it was not until the final eventful disclosure that occurred on October 30, 2008—via the Company's 3rd quarter earnings release statement—that the statute of limitations began to run.

The court declines to dismiss plaintiffs' claims as time-barred. The determination of inquiry notice is fact-intensive. *See, e.g., La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 847, 850 (11th Cir.2004) (holding that a decline in stock price alone is not enough to put investors on inquiry notice when stock had history of volatility);

*Caprin v. Simon Transp. Serv., Inc.*, 99 Fed.Appx. 150, 156–57 (10th Cir.2004) (stating that plaintiff was on inquiry notice of the company's fraudulent activity in light of the dramatic decline in stock price and press release projecting loss); *Benak v. Alliance Capital Management, LP*, 435 F.3d 396 (3d Cir.2006) (mutual fund investors are held to a lower standard of inquiry notice because they may be unaware of where their investments are placed); *Swack v. Credit Suisse First Boston*, 383 F.Supp.2d 223, 234–236 (D.Mass.2004) (finding that extensive reports about conflicts of interest were not significant enough to trigger the limitations period until the facts were revealed in a government investigation); *Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993) (holding that inquiry notice was provided by SEC filings); *In re Dynegy, Inc. Sec. Litig.*, 339 F.Supp.2d 804 (S.D.Tex.2004). *But see Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir.2003) (holding that SEC filing of restated earnings did not put the plaintiffs on inquiry notice because the report attributed the restatement to a "benign" accounting change and failed to disclose the presence of serious inventory problems); *Shah v. Stanley*, No. 03 CIV. 8761(RJH), 2004 WL 2346716, at *9–13 (S.D.N.Y. Oct. 19, 2004), aff'd, 435 F.3d 244 (2d Cir.2006) (finding that suit was time barred because an investor in a security firm had inquiry notice about conflicts of interest when articles critical of the security firm's practices were published); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431 (S.D.N.Y.2003) (finding that SEC subpoena by itself does not trigger inquiry notice).

Here, in light of the various purported disclosures and relevant dates that plaintiffs allege, stemming throughout the class period—the last of which allegedly occurred in the October 30, 2008 earnings release statement—the court finds that resolution of the limitations issue is not appropriate at the pleading stage, but must be determined once an evidentiary record has been developed. Moreover, while defendants are correct that plaintiffs allege multiple disclosures beginning as early as June 5, 2007 regarding the exposure of defendants' fraud, plaintiffs are also entitled to the reasonable inference that it is the course of all disclosures collectively that ultimately placed plaintiffs on notice of the need to investigate for fraud—i.e., that it was no single disclosure that was dispositive, but rather all the disclosures collectively.

The court accordingly DENIES defendants' motion to dismiss plaintiffs' claims on statute of limitations grounds.

5. *Whether Plaintiffs State 'Control Person' Claims or 'Insider Trading' Claims Under the Securities Laws*

Defendants point out that, to state a claim for control person liability under section 15 of the Securities Act or section 20(a) of the Exchange Act, or for insider trading under Section 20A of the Exchange Act, plaintiffs must plead a predicate violation of section 11 or 10(b). Since they have failed to do so here, therefore, plaintiffs' claims must fail as to section 15 and 20(a), too. To the extent, moreover, that plaintiffs also seek to bring control person claims against the outside directors of Bare, these claims also fail because plaintiffs fail to plead specific facts establishing that these persons exercised a "significant degree of day to day operational control" over the company, as the law requires. In response, plaintiffs do not specifically rebut or challenge defendants' argument on this point, except with a brief argument included as part of plaintiffs' section 10(b) arguments. Namely, plaintiffs state that their allegations generally demonstrate that each Bare defendant was

a key player in the day to day operations of the company.

■ Adequate pleading of a primary violation of sections 11 and 10(b) is required for a plaintiff to adequately plead control liability under § 20(a) of the Exchange Act and § 15 of the Securities Act. *See, e.g.*, 15 U.S.C. § 78t. Accordingly, because the complaint fails to state a claim for primary liability under the Securities Act or the Exchange Act, it follows that the court must therefore GRANT defendants' motion to dismiss plaintiffs' claim for control person liability.

C. Underwriters' Motion to Dismiss

Separately, the Underwriter defendants contend that dismissal of plaintiffs' Section 11 and Section 12(a)(2) claims against the underwriters are time-barred. Defendants make two general arguments in support of dismissal: first, that plaintiffs have failed to sufficiently plead compliance with the statute of limitations; and second, that plaintiffs could not satisfy their pleading burden with respect to the statute of limitations at any rate, given the substantive allegations of the complaint. Plaintiffs contest defendants' assertions, arguing that the defendants are incorrect as to the time frame in which plaintiffs' causes of action accrued, and that the statute of limitations issue is not appropriate for resolution at the pleading stage in this instance.

■ As a general matter, the controlling standard for accrual of plaintiffs' claims is not in dispute: plaintiffs must have filed suit within one year of the date they discovered or should have discovered that the alleged statements or representations were untrue. *See* 15 U.S.C. § 77m. As the Supreme Court recently recognized, "discovery of the facts constituting

the violation" occurs not only once a plaintiff actually discovers the facts, but also when a hypothetical reasonably diligent plaintiff would have discovered them. *See Merck & Co., Inc. v. Reynolds,* —— U.S. ——, 130 S.Ct. 1784, 1795, 176 L.Ed.2d 582 (2010) (" "discovery" as [applied to Exchange Act limitations period] encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known."); *see also Gray v. First Winthrop Corp.,* 82 F.3d 877, 881 (9th Cir.1996); *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1412 (9th Cir.1987).[6]

■ In contending that plaintiffs have fallen short of their duty to adequately plead compliance with the statute of limitations, defendants rely on *Toombs v. Leone,* 777 F.2d 465 (9th Cir.1985). As a general matter, defendants are correct that *Toombs* holds that plaintiffs are required to plead sufficient facts to demonstrate conformity with the statute of limitations. However, *Toombs* does not detail the kind of facts that are required in order for a plaintiff to adequately allege conformity with the statute of limitations. In the case before it, the *Toombs* court merely held that plaintiff's failure to allege the date upon which his securities were delivered, or any dates upon which securities were sold to other investors, ultimately rendered plaintiff's claim time-barred. *See id.* at 468. Here, by contrast, the court finds that plaintiffs have generally alleged, at a minimum, the amounts of stock sold at different points in time, the amount of proceeds as a result of the alleged sales, and the amount of alleged fees received by the Underwriter defendants. *See, e.g.,* CCC ¶¶ 29, 71–72, 81; *see also id.,* ¶ 230. As such, the court declines defendants' invitation to dismiss plaintiffs' claims for

**6.** While *Merck* applied this rule to a 10(b) violation, it is the same rule applicable to

section 11 Securities Act claims such as those asserted against the underwriters here.

failure to appropriately plead compliance with the statute of limitations under *Toombs.*

Defendants also focus on the substance of plaintiffs' allegations, contending that plaintiffs' allegations regarding defendants' alleged misstatements make clear that the facts concerning all purported misstatements were in the public domain in 2007 and the first part of 2008—a fact which makes plaintiff's August 2009 complaint as to the underwriters untimely. Defendants have broken the alleged misstatements down into the following three now familiar categories: (1) the Company's statements that it was marketing and selling its products through premium channels, when in reality its products were also available at Costco and Target; (2) the Company's reliance on "club deals," in which customers found themselves receiving products they had not ordered and/or did not want; and (3) the Company's multi-channel distribution strategy, and/or the Company's infomercial program, and/or the Company's expansion into brick and mortar sales venues, all of which were failing or in jeopardy of failing.

On balance, the court is unpersuaded by defendants' arguments. As was explained in connection with the Individual defendants' motion to dismiss on statute of limitations grounds, the question of inquiry notice—and the commencement of the statute of limitations on plaintiffs' claims—is fact-intensive. As a result, and because the court does not find plaintiffs' allegations so devoid of substance that they are completely lacking in plausibility with respect to the running of the statute of limitations, plaintiffs are entitled to develop a factual record prior to resolution of the issue.

Thus, the Underwriter defendants' motion to dismiss on statute of limitations grounds, is accordingly DENIED without prejudice.

## D. Leave to Amend

Plaintiffs request that they be given leave to amend the complaint. Federal Rule of Civil Procedure 15(a) dictates that leave to amend be "freely given" when justice so requires. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Accordingly, the court GRANTS plaintiffs' request for leave to amend, so that plaintiffs may attempt to cure the deficiencies noted herein. Plaintiffs' amendments are limited to the grounds discussed herein; plaintiffs may not attempt to broaden the scope of their claims against defendants beyond that which has already been pled and discussed.

## E. Conclusion

For all the foregoing reasons, the court hereby GRANTS in part and DENIES in part the Individual defendants' motion to dismiss; GRANTS in part and DENIES in part defendants' request for judicial notice; GRANTS plaintiffs' request for judicial notice; GRANTS in part and DENIES in part plaintiffs' motion to strike; and DENIES the Underwriter defendants' motion to dismiss. Leave to amend is also granted, and any amended complaint shall be filed within 28 days of the filing of this order.

**IT IS SO ORDERED.**